Filed 6/14/24  P. v. Bryant CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| THE PEOPLE, | C096799 |
| Plaintiff and Respondent, | (Super. Ct. No. F18000158A) |
| v. | |
| SEAN DANIELLE BRYANT, | |
| Defendant and Appellant. | |

Defendant Sean Danielle Bryant beat his 70-year-old friend with a metal chain, shot him with an arrow, shot him multiple times with a paintball gun that he modified to shoot glass marbles, and then instructed someone else to beat him with a baseball bat. After a jury found Bryant guilty of first degree murder and found true a "murder with torture" special circumstance, the trial court imposed a sentence of life without the

1

possibility of parole. On appeal, Bryant contends the trial court erred (1) by failing to instruct the jury that evidence of voluntary intoxication could be considered in deciding whether he acted in the heat of passion and (2) by instructing the jury that the prosecution did not have to prove motive in connection with the murder and the special circumstance allegation. We affirm.

## BACKGROUND

## I

### *Factual Background*

One morning in April 2018, 51-year-old Bryant and his 70-year-old friend Stanley Norman were both intoxicated when they went to Bryant's girlfriend's house. Bryant had been dating his girlfriend (B.P.) for about five months and had a key to the house she shared with her two teenage daughters. After the men arrived, Bryant went to sleep in an upstairs bedroom, Norman stayed downstairs, and B.P. began to cook breakfast. At one point, Norman put his arm around B.P.'s younger daughter and tried to kiss her.

B.P.'s daughter went to a bedroom and began to cry. B.P. followed her daughter into the room and told her she would ask Bryant and Norman to leave, but would not tell Bryant what Norman had done, because Norman was too drunk to know what he was doing and she feared Bryant, a "hot headed" person, would become very upset. Following through on her plan, B.P. went upstairs, woke Bryant, and told him "things were getting weird and . . . they . . . needed to leave." Bryant asked B.P. if "anything sexual happened," and B.P. said, "[N]o, things were just getting weird." No more than 30 minutes elapsed between when Bryant went upstairs to sleep and when B.P. woke him.

Bryant came downstairs and did not appear to be upset. As the men joked with each other they fell to the floor and began wrestling in a playful and joking manner. B.P. wanted the men to leave, so she walked over to help Norman get up. As she did so,

2

Norman grabbed her leg and said something like, "I want you" or "I want her." Bryant immediately got upset and yelled at Norman to apologize.

As he sat up against the base of a counter that separated the living room and kitchen, Norman appeared to not understand why Bryant wanted him to apologize. Bryant continued to yell at Norman as he grabbed an "air soft" gun or paintball gun that he previously had shown to B.P. when he told her he had modified the weapon "so that it was more high powered and that it could hurt somebody." B.P. had seen Bryant use the weapon to shoot glass marbles into a teddy bear from a distance of 15 feet.

Bryant continued demanding an apology and began shooting marbles at the base of the counter near where Norman was sitting, though Norman still appeared to be confused as to why Bryant wanted him to apologize. When Norman crawled away from the base of the counter, Bryant shot him in the buttocks with a crossbow. The arrow penetrated Norman's buttocks and remained lodged there.

Scared, B.P. and her daughters went into a first-floor bedroom as Bryant began to punch Norman in the face. Later, they heard Bryant drag a large, thick chain along the floor and then hit Norman with it multiple times. They then heard more shots from the paintball gun. At one point, B.P. saw Bryant hit Norman hard somewhere on his body with the bottom of the handle of a Ka-Bar knife.

Sometime in the afternoon, hours after he began harming Norman, Bryant pulled B.P.'s older daughter out of the first-floor bedroom and told her he was going to town, showed her a gun and how to use it, and said she "would have to shoot" Norman if he moved. After Bryant left, B.P. went into the living room and saw Norman. He was moaning, bloody, and had a marble lodged in his face. Bryant returned about 30 minutes later with codefendant Michael McCauley. Bryant told McCauley to hit Norman with a baseball bat. McCauley hit Norman in the torso. Bryant told McCauley to hit harder. McCauley complied.

3

Lying on the floor just before McCauley struck him the first time, Norman had raised his hands to his face. After McCauley struck him, Norman stopped moving. "Why did you make me do this?" Bryant yelled at Nelson before he tried to perform CPR.

II

*Procedural Background*

At Bryant's jury trial, the prosecution pursued two theories of first degree murder: (1) willful, deliberate, and premeditated murder and (2) murder by torture, which does not require an intent to kill, but does require a causal relationship between a torturous act and death. The prosecution also alleged a torture-murder special circumstance, which does require intent to kill and contemplates torturous acts occurring within a larger time frame that do not necessarily cause death. (See Pen. Code,[1] §§ 189, subd. (a), 190.2, subd. (a)(18)); *People v. Jennings* (2010) 50 Cal.4th 616, 647; *People v. Bemore* (2000) 22 Cal.4th 809, 842-843.)

A.     *Jury Instructions*

The trial court instructed the jury that a defendant is guilty of first degree murder under the theory of murder by torture if: (1) he willfully, deliberately, and with premeditation intended to inflict extreme and prolonged pain on the victim while the victim was alive; (2) he intended to inflict such pain on the victim for the calculated purpose of revenge, extortion, persuasion, or any other sadistic reason; (3) the act causing death involved a high degree of probability of death; and (4) torture was a cause of the victim's death.

Regarding the torture-murder special circumstance, the trial court told the jury the prosecution had to prove Bryant: (1) intended to kill Norman; (2) intended to inflict

---

[1] Undesignated statutory references are to the Penal Code.

4

extreme physical pain and suffering on Norman while Norman was alive; (3) intended to inflict such pain and suffering on Norman for the calculated purpose of revenge, extortion, persuasion, or any other sadistic reason; and (4) did an act involving the infliction of extreme physical pain and suffering on Norman.

The trial court further instructed that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone "because of a sudden quarrel or in the heat of passion," which occurs if: (1) the defendant was provoked; (2) as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and (3) the provocation would have caused a person of average disposition to act rashly and without due deliberation. The trial court also instructed the jury that if enough time passed between the provocation and the killing for a person of average disposition to "cool off" and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

Instructing the jury with CALCRIM No. 625, the trial court explained that jurors could consider evidence of "voluntary intoxication only in a limited way," including deciding whether Bryant acted with an intent to kill or acted with deliberation and premeditation. "You may not consider evidence of voluntary intoxication for any other purpose," the trial court said.

The trial court also instructed the jury that while the prosecution did not have to prove Bryant had a motive to commit murder or the torture-murder special circumstance, the jury could consider whether Bryant had a motive.

B.  *Closing Arguments*

If Bryant had picked up a weapon and killed Norman the moment after Norman grabbed B.P.'s leg and said, "I want you," that "would probably be . . . voluntary manslaughter," the prosecutor argued in closing argument to the jury. "[B]ut that is not what happened," the prosecutor maintained, because "hours of torture" followed

5

Norman's comment to B.P. According to defense counsel, "the real range" of culpability for Bryant's conduct was voluntary manslaughter at minimum and second degree murder at most, "because not all of the elements . . . of first degree murder were met."

C.    *Verdicts and Sentencing*

In May 2022, after the jury found Bryant guilty of first degree murder (without choosing a specific theory of murder) and found true the torture-murder special circumstance, the trial court imposed a sentence of life without the possibility of parole. Bryant timely appealed in July 2022. After numerous extensions of time for preparation of the record, a motion to augment the record, and extensions of time for preparation of the augmented record, Bryant's opening brief was filed in January 2024, and this case became fully briefed on April 12, 2024.

DISCUSSION

I

*Voluntary Intoxication and Heat of Passion*

Bryant contends the trial court erred by failing to instruct the jury that it could consider evidence of his voluntary intoxication in deciding whether he acted in the heat of passion. The People argue (1) this contention is forfeited on appeal because Bryant did not raise it below, (2) on the merits, the trial court did not err, and (3) any error was harmless. On de novo review (*People v. Mitchell* (2019) 7 Cal.5th 561, 579), we conclude the trial court did not err.[2]

In *People v. Soto* (2018) 4 Cal.5th 968 (*Soto*), our Supreme Court considered section 29.4 and its history in ruling that evidence of voluntary intoxication is not admissible on the question whether a defendant believed it necessary to act in self-

_____

[2] This conclusion makes it unnecessary to consider Bryant's other contentions on this issue, including that trial counsel provided ineffective assistance in failing to raise the issue below.

6

defense.[3]  (*Id.* at p. 970 ["CALCRIM No. 625 correctly permits the jury to consider evidence of voluntary intoxication on the question of whether defendant intended to kill but not on the question of whether he believed he needed to act in self-defense"].)  The reasoning of *Soto* renders Bryant's claim unpersuasive.

In that case, our Supreme Court observed the Legislature, in enacting what is now section 29.4, intended to overrule the majority decision in *People v. Whitfield* (1994) 7 Cal.4th 437 and instead "adopt[ ] Justice Mosk's position that evidence of voluntary intoxication is not admissible on the question of implied malice, that is, to prove that defendants did not know of the danger they were creating by their actions, or that they did not consciously disregard that danger."  (*Soto, supra*, 4 Cal.5th at p. 977.)  The court explained that "it is clear what the Legislature intended to achieve when it amended" what is now section 29.4: "to prohibit voluntary intoxication from being an excuse for poor judgment when someone kills."  (*Soto*, at p. 978.)  So in the case of a defense theory that a killing was voluntary manslaughter because it was the result of an actual but unreasonable belief in the need to act in self-defense, even though intoxication can "impair the sound judgment that is needed when deciding to use lethal force in self-defense," the Legislature "apparently agreed with Justice Mosk that a defendant who acts with conscious disregard for life should be punished for murder *regardless* of whether

---

[3]  Section 29.4 provides in relevant part:  "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition.  Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.  [¶]  (b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought."

voluntary intoxication impaired his or her judgment" that lethal force was necessary.[4] (*Id.* at pp. 977-978, italics added.)

This reasoning applies to the doctrine of heat of passion voluntary manslaughter. The heat of passion requirement for manslaughter has both an objective and a subjective component. While the circumstances giving rise to the heat of passion are viewed objectively (because the heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances) the defendant also must actually, subjectively, kill under the heat of passion. (*People v. Rountree* (2013) 56 Cal.4th 823, 855.) Bryant accepts evidence of his voluntary intoxication would not be relevant to the objective component of this doctrine, but argues it would be relevant to the subjective component. But like using evidence of voluntary intoxication to prove a defendant believed it necessary to kill in self-defense, using evidence of voluntary intoxication to prove rashness attempts to use such evidence to excuse poor judgment that resulted in a killing. As our Supreme Court explained in *Soto*, that is precisely what the Legislature sought to prohibit in amending what is now section 29.4. There was no instructional error.

Citing the *Soto* concurring and dissenting opinion, Bryant contends *Soto* "was wrongly decided." He contends evidence of voluntary intoxication should be admissible on the question whether a defendant was acting in a heat of passion when killing

---

[4] A two-justice concurring and dissenting opinion argued the majority improperly rejected a straightforward reading of section 29.4: (1) because section 29.4, subdivision (b) expressly permits the introduction of evidence of voluntary intoxication on the issue of whether a defendant " '*harbored express malice aforethought*,' " (2) and express malice requires an intent to kill " 'unlawfully,' " (3) then evidence of voluntary intoxication should be admissible when the defense theory is that there was not an intent to kill unlawfully, but rather an intent to kill under the honest but unreasonable belief in the need to act in self-defense. (*Soto*, *supra*, 4 Cal.5th at p. 980 (conc. & dis. opn. of Liu, J.).)

someone, because (1) section 29.4 says evidence of intoxication is admissible on the issue whether the defendant acted with express malice and (2) a person who kills in a heat of passion does not act with express malice. Bryant also argues *Soto* "did not consider the present question." These contentions are unavailing. We must follow the holdings of our Supreme Court (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), and to the extent pertinent analysis in an opinion is properly characterized as dictum, it is still highly persuasive (*People v. Reyes* (2020) 56 Cal.App.5th 972, 994).

II

*Motive*

Bryant's second claim is that the trial court erred by instructing the jury that the prosecution did not have to prove motive in connection with the murder and the special circumstance allegation. As Bryant appears to acknowledge this claim is foreclosed by *People v. Miles* (2020) 9 Cal.5th 513, 579-580, wherein our Supreme Court held motive was not an element of murder by torture and explained that while the prosecution generally must prove a required mental state such as malice or intent, the reason *why* someone commits a crime (in other words, the motive) is rarely an element that must be proven. Thus, the sadistic reason element of murder by torture articulated by the trial court to the jury in this case is not about motive. (*Ibid.*; see *id.* at p. 580 ["the murder by torture charge here did not reference or require motive, or any derivation of that term"].) Likewise, the sadistic reason element of the torture-murder special circumstance articulated by the trial court to the jury in this case is not about motive.

## III

### *No Cumulative Error*

As Bryant's claims of trial court error lack merit, so does his claim that the cumulative effect of error was prejudicial.

### DISPOSITION

The judgment is affirmed.

/s/

BOULWARE EURIE, J.

We concur:

/s/

HULL, Acting P. J.

/s/

DUARTE, J.